IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BENITA A. GILES,            )
                            )
            Plaintiff,      )
                            )   Civil Action No. 05-201 Erie
                            )
        v.                  )
                            )
JO ANNE B. BARNHART,        )
Commissioner of Social Security, )
                            )
            Defendant.      )

## MEMORANDUM OPINION

McLAUGHLIN, J.

Plaintiff, Benita A. Giles, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Giles filed an application for DIB on August 16, 2002, alleging disability since October 4, 1997 due to chronic fatigue syndrome, Reiter's syndrome,[1] carpal tunnel syndrome, sinus problems and depression (Administrative Record, hereinafter "AR", 61-63, 71).[2] Her application was denied, and Giles requested a hearing before an administrative law judge ("ALJ") (AR 42-47). Following hearings held on November 5, 2003 and October 19, 2004, the ALJ found that Giles was not entitled to a period of disability or disability insurance under the Act (AR 12-19, 325-358). Giles' request for review by the Appeals Council was denied (AR 5-7), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for

---

[1]"Reiter's syndrome" refers to "a triad of symptoms of unknown etiology comprising urethritis, conjunctivitis, and arthritis." *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1638 (28th ed. 1994).

[2]As discussed later in our Opinion, Giles stipulated to an onset date of June 30, 2000 with respect to her alleged mental impairments at the first hearing (AR 342).

1

summary judgment. For the reasons set forth below, we will deny the Plaintiff's motion and grant the Defendant's motion.

## I. BACKGROUND

Giles was born on June 25, 1964, and was 40 years old on the date of the ALJ's decision (AR 12, 61). She is a high school graduate, with past relevant work experience as an instructor at a retirement center, a waitress, and a nurses aide (AR 72).

### A.     *Pre-hearing medical evidence*

Treatment notes from Primary Care Partners show that on October 8, 1997 Giles complained of soreness in the lower back and mid-shoulder area (AR 234). In December 1997, she reported tightness across the lumbosacral area, which was aggravated by caring for her new baby, and achiness in the neck and shoulder area (AR 234). Physical examination revealed that her paraspinal muscles were tight and sensitive to touch (AR 234). On March 18, 1998, Giles reported that her tightness and achiness in her neck, shoulders and lower back was getting worse, possibly due to lifting her baby (AR 234).

Giles was evaluated by John Hood, M.D. on September 4, 1998 for gestational carpal tunnel syndrome (AR 221-222). Physical examination revealed she had good neck, shoulder, elbow, wrist and digital motion bilaterally (AR 221). Dr. Hood recommended anti-inflammatory treatment (AR 221). In November and December of 1998, Giles underwent steroid injections (AR 218-219).

In February 1999, Giles returned to Dr. Hood who indicated that her injection had worn off, and referred her for an EMG and nerve conduction velocity test (AR 217). An electromyography study conducted on February 24, 1999 revealed that Giles had a mild bilateral median sensory neuropathy, most likely due to compression at the wrist, but there was no evidence of ulnar neuropathy, radial sensory neuropathy, or radiculopathy (AR 130-132). In March 1999, Giles returned to Dr. Hood with "very mild" carpal tunnel syndrome, worse on the right than on the left (AR 215). Although she still had some dysfunction and discomfort, Dr.

Hood found her significantly improved and recommended continued conservative treatment (AR 215).

Giles was seen by Joseph Rowane, D.O. on June 15, 2000 for follow-up of her asthma (AR 196). She complained of a persistent cough and wheezing despite a seven day course of antibiotics and a full course of steroids (AR 196). Her lungs exhibited diminished breath sounds with expiratory wheezes (AR 196). She was assessed with asthma exacerbation, history of moderate persistent asthma, history of tobacco abuse, and history of rhinosinusitis (AR 196). Dr. Rowane increased her Aerobid dosage and continued Accolate (AR 196).

From May 2000 through May 2001, treatment notes from Primary Care Partners show that Giles continued to complaint of tightness, soreness and achiness in her neck, shoulders and lower back (AR 230, 232-233).

Giles was seen by Ann McDonald, M.D., at Community Integration on June 30, 2000 (AR 166-168). She complained of some depression, increased anxiety, increased fatigue, nightmares, decreased appetite and poor concentration (AR 166). Dr. McDonald noted that she was fairly cooperative with adequate hygiene and appropriate dress (AR 167). Her eye contact was fair, and she exhibited some psychomotor agitation, impaired impulse control and "vaguely unusual mannerism" (AR 167). Her speech was somewhat pressured, rapid, loud at times, and over productive (AR 167). Dr. McDonald indicated that her affect was quite labile and inappropriate at times, and at points very guarded, suspicious and anxious (AR 167). She denied any suicidal or self-destructive behavior (AR 167). Dr. McDonald found she had poor judgment, limited insight and fair motivation (AR 167). She diagnosed Giles with major depression, recurrent, and borderline personality disorder, and assigned her a Global Assessment of Functioning ("GAF") score of 45 (AR 167).[3] She prescribed Wellbutrin (AR 168).

---

[3]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep job)."

Giles began counseling at Community Integration in August 2000 (AR 164). Treatment notes from August 2000 through December 2000 showed that while her depression continued, her condition improved and her concentration was good (AR 162-164).

Giles returned to Dr. Rowane on March 22, 2001 reporting occasional exacerbations of her asthma (AR 195). Dr. Rowane noted that she had been on five courses of steroids over the past year, but "disappointedly" continued to smoke, although Giles reported she had cut down (AR 195). On physical examination, her lungs were clear with no wheezes (AR 195). Dr. Rowane had a "long talk" with Giles with regard to her lung disease and the need for discontinuation of smoking altogether (AR 195).

Community Integration treatment notes dated May 18, 2001 revealed that Giles' energy and concentration were good and her condition was stable (AR 158). In June 2001, her individual therapy was terminated by mutual agreement, and notes indicated that she was much improved with a GAF score of 60 (AR 151).[4]

In August 2001, Giles returned to Community Integration and reported problems with her neighbors, and it was noted that her mood was sad and her affect was tense and anxious (AR 158).

On December 6, 2001, Dr. Rowane reported that Giles' airway symptoms were minimal, and her lungs revealed clear breath sounds bilaterally (AR 194). She was assessed with moderate persistent asthma, recurrent rhinosinusitis, and history of tobacco abuse, in cessation for six months (AR 194). Dr. Rowane continued her corticosteroids and bronchodilaters (AR 194).

Community Integration progress notes dated February 12, 2002 showed that although Giles was depressed and anxious, her mood and cognition were within normal limits (AR 147). It was noted that she suffered from occasional mood swings and depression, but was essentially

---

*See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

[4]Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

stabilized and her treatment was partially effective (AR 147). She was assigned a GAF score of 55 (AR 147). In May 2002, she was assigned a GAF score of 45, but her appearance, behavior, mood/affect and cognition were all within normal limits, and her response to treatment was noted as "good" (AR 144).

On May 26, 2002, Giles presented to the emergency room complaining of left leg pain (AR 187). Although she had some pain over the greater trochanter, she exhibited a full range of motion in her left hip and there was no evidence of erythema or induration (AR 188). She was diagnosed with left hip pain, questionable greater trochanteric bursitis, and prescribed pain medication (AR 188).

In June 2002, Giles reported to Primary Care Partners that she was still achy and tight, and complained of forearm pain from her elbows to her fingers (AR 231). On June 11, 2002 Giles presented to the emergency room for complaints of right hip pain (AR 185-186). Physical examination failed to reveal any edema, induration or erythema (AR 186). She had moderate tenderness on palpation but exhibited a full range of motion (AR 186). An x-ray of the right hip failed to reveal any bony abnormalities (AR 186). She was diagnosed with monoarthritis of the right hip, probably secondary to Reiter's syndrome, and prescribed pain medication (AR 186).

On July 1, 2002, Giles presented to Primary Care Partners complaining of pain in her neck and forearms down to her fingers (AR 231). She complained that her hands were tight and achy upon awakening, and splints provided no relief (AR 231). It was recommended that she contact her previous surgeon for further evaluation and testing (AR 231).

Giles returned to Dr. Hood on July 10, 2002 who noted her Phalen and Tinsel's test were positive bilaterally (AR 213). On August 7, 2002, Dr. Hood reported that her EMG was abnormal and he recommended surgical intervention (AR 212). He performed a carpal tunnel release on Giles' left hand in October 2002, and by November 5, 2002, reported that she was doing quite well and had full finger flexion and extension (AR 209, 211).

Community Integration treatment notes dated September 5, 2002 show that Giles

complained of depression, anxiety and weight gain (AR 138). Her behavior was noted as within normal limits and withdrawn, and her mood/affect was depressed (AR 138). Her response to treatment was reported as fair to poor, and she was assigned a GAF score of 45 (AR 138).

Giles returned to Dr. Rowane on October 9, 2002, who found that her lungs revealed clear breath sounds without wheezes, but her heart was tachycardic (AR 193). Although Dr. Rowane did not believe that her medications were the etiology for her elevated heart rate, he reduced her dosage of Advair (AR 193).

On November 12, 2002, Giles was seen by Mary Russo-Colt, D.O., at Primary Care Partners, and reported a history of anxiety, depression, allergies, Reiter's syndrome, chronic fatigue syndrome and pain (AR 228). She claimed she was unable to work and was under a great deal of stress, and had weight gain secondary to her medications (AR 228). Dr. Russo-Colt noted she was pleasant but anxious (AR 228). Giles' neurological examination was intact (AR 228). Dr. Russo-Colt opined that her medical conditions were reasonably stable, but her symptoms of anxiety and depression was worsening due to ongoing social stressors (AR 228). Diet and exercise were discussed, and she was referred to Theresa Fryer, M.D., regarding her chronic pain (AR 228).

Giles returned to Dr. Russo-Colt for bursitis hip pain on December 17, 2002 (AR 228). She complained of bilateral leg pain while making beds, bending or lifting in her housework (AR 228). Dr. Russo-Colt found on physical examination that Giles had pinpoint tenderness in the trochanteric bursa, but no back pain, paramuscular tenderness or ropiness, and no pain on straight leg raising test (AR 228). Her hips rotated "beautifully" and she was neurologically intact (AR 228). Dr. Russo-Colt recommended heat, stretching and appropriate shoes for her bursitis, and recommended she undergo an injection performed by Dr. Fryer (AR 228). She was prescribed Darvocet for pain (AR 228).

Giles was seen by Dr. Fryer on December 19, 2002, who noted that she had last seen Giles in 1995 for Reiter's syndrome (AR 238). Dr. Fryer found minimal tenderness over Giles'

hip area and noted that she was not in pain lying on her side (AR 238). She assessed her with history of Reiter's syndrome with pain in the lower back, and administered a joint injection for her pain (AR 238).

Giles underwent a psychological disability evaluation conducted by Martin Meyer, Ph.D. on February 5, 2003 (AR 239-242). Giles reported that her last psychiatric counseling occurred one year prior and her medication regime included Zoloft, Wellbutrin, Ativan and Topamax (AR 240). She reported she suffered from overwhelming sadness, extreme apathy and lethargy, fatigue, lack of motivation and isolation (AR 240). She claimed to have occasional suicidal ideation but denied any intent (AR 240). Dr. Meyer found she had a depressed mood and pressured speech, but there was no evidence of thought process disturbance or neural sensory problems (AR 240-241). She had average intelligence, but her ability for sustained concentration was poor (AR 241). Her social judgment was appropriate but her insight was poor (AR 242). Dr. Meyer found that her prognosis was poor in terms of higher level functioning and personality integration (AR 242). He diagnosed Giles with dysthymic disorder and generalized anxiety disorder, and assigned her a GAF score of 50 (AR 242). Dr. Meyer concluded that Giles' ability to make occupational adjustments was "fair" or between "fair" and "poor/none" (AR 245).

On March 19, 2003, Roger Glover, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and opined that Giles was "not significantly limited" to only "moderately limited" in most areas of work-related functioning (AR 250-251). Dr. Glover concluded that Giles was mentally capable of carrying out uncomplicated work assignments in a stable work setting (AR 252).

Giles returned to Dr. Fryer on May 30, 2003 and complained of pain at the base of her spine and knees (AR 280). On physical examination, no tenderness in the lower back was noted, and she had a full range of motion of her hips without pain (AR 280). Some discomfort with range of motion of the knees was noted (AR 280). Dr. Fryer formed an impression of history of Reiter's syndrome, and recommended a bone scan (AR 280). In June 2003, Dr. Fryer noted that

her bone scan was "entirely normal" except for some arthritis in her fingers and carpal area (AR 279).

Community Integration progress notes dated August 6, 2003 show that Giles complained of being very depressed, with no motivation or concentration (AR 293). She had no physical complaints (AR 293). Her appearance, behavior, mood/affect and cognition were within normal limits, and she was assigned a GAF score of 50 (AR 293)

In October 2003, x-rays of Giles' sacrum, coccyx, and sacro-iliac joints were normal (AR 284-286). On October 20, 2003, Dr. Fryer completed a physical functional capacity assessment form opining that Giles could lift and carry up to ten pounds frequently; walk and stand less than two hours in an eight hour day; sit less than six hours in an eight hour day; and push/pull without limitation (AR 272-277). Dr. Fryer noted Giles' suffered from fatigue, an aching back, daytime somnolence, and deconditioning (AR 273). She opined that at Giles' present level of functioning, she would have difficulty working eight hours per day without rest (AR 273).

On October 24, 2003, Community Integration treatment notes reflected that Giles reported depression and problems sleeping (AR 292). Although she was assigned a GAF score of 45, her appearance, behavior, mood/affect and cognition were all reported as within normal limits (AR 292).

### B.   *November 5, 2003 hearing*

Giles and Karen Krull, a vocational expert, testified at the first hearing held by the ALJ on November 5, 2003 (AR 28-58). Giles testified that her Reiter's syndrome caused pain in her left knee, lower back, upper right arm and neck (AR 331-332). She claimed that while pain medication took the edge off her pain, it did not afford her significant relief (AR 332). She further testified that she suffered from depression and medication did not address her symptoms (AR 333). She claimed her depression was not getting better, and she had a hard time concentrating and focusing (AR 334). Her pain and depression made it difficult for her to perform household chores and care for her children (AR 334-335). She was able to clean house

for approximately twenty to thirty minutes before she had to stop due to pain and fatigue (AR 335). Carpal tunnel release surgery resulted in better use of her hands (AR 335-336). She was able to drive approximately once per week (AR 331).

Karen Krull testified that Giles' past work experience at the Barber Center was heavy and semiskilled (AR 340). Following this testimony, the ALJ engaged in a discussion with Giles' representative (AR 340-342). The ALJ stated that he was of the opinion that Giles could not perform the Barber Center job, but was not sure if there was any job that she could do that would require her to work eight hours a day, five days per week (AR 340). He further stated he did not think her medical problems alone disabled her, but questioned her ability to concentrate and maintain persistence and pace (AR 340-341). The ALJ indicated that while Giles had alleged disability since 1997, his review of the psychological evidence failed to reveal any evidence prior to June 2000 (AR 341). He requested that Giles submit updated treatment records for his review (AR 341-342). Following consultation with her representative, Giles stipulated to an alleged onset date of June 30, 2000 (AR 342).

### C.     Post-hearing medical evidence

On April 7, 2004, Phillip Balk, M.D., a state agency reviewing physician, completed a medical source statement of Giles' physical ability to engage in work-related activities (AR 304-311). Dr. Balk opined that Giles could lift 50 pounds frequently; stand/walk for six hours; sit for an unlimited number of hours in an eight hour day; and could not engage in postural activities (AR 304-307).

Christine Martone, M.D., a state agency reviewing physician, reviewed the psychological evidence of record and completed a medical source statement of Giles' mental ability to engage in work-related activities (AR 312-318). Dr. Martone found that Giles had no limitations in her ability to understand, remember and carry out short, simple instructions and make simple work related decisions; slight limitations in her ability to interact appropriately with supervisors and co-workers; moderate limitations in her ability to understand, remember and carry out detailed

instructions; interact appropriately with the public; and respond appropriately to work pressures and changes in the work setting (AR 312-313). Dr. Martone opined that Giles' ability to complete a normal work day would be moderately impaired (AR 313). She further concluded that Giles' mental impairments were not of listing-level severity (AR 314). On June 4, 2004, Dr. Martone further opined that Giles retained the ability to consistently complete a normal 40 hour work week (AR 323).

### D.   *October 19, 2004 hearing*

Due to the receipt of additional medical information, the ALJ conducted a second hearing on October 19, 2004, at which time Giles and Joseph Kuhar, a vocational expert, testified (AR 346). Giles testified that her depression had not improved and had gotten worse since the last hearing and her medication had been changed (AR 348). She claimed an inability to drive and sleepiness due to the side effects of her medication (AR 349-350).

Mr. Kuhar testified that Giles' previous position at the Barber Center was semiskilled and heavy (AR 352). The ALJ asked Mr. Kuhar if work existed for an individual of Giles' age, education and past work experience, who was limited to sedentary work that allowed the worker to alternate sitting and standing, that consisted of no more than simple, routine, repetitious tasks with one- or two-step instructions, performed in a low stress environment, defined as work requiring few decisions, that required no more than occasional contact with the public and co-workers (AR 352). The vocational expert testified that such an individual could perform work as a food sorter, routing clerk, and assembler (AR 352-353). He further testified that no jobs existed if the individual were off task approximately half the normal workday (AR 354).

Following the hearing, the ALJ issued a written decision which found that Giles was not entitled to a period of disability or disability insurance within the meaning of the Social Security Act (AR 12-19). Giles' request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-7). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c); *Matullo v. Bowen*, 926 F.2d 240, 244 (3rd Cir. 1990) (claimant is required to establish that he became disabled prior to the expiration of his insured status); *see also* 20 C.F.R. § 404.131. Giles' insured status expired on December 31, 2002; therefore she must show she was disabled on or prior to that date for purposes of entitlement to DIB.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers

11

> from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Giles' case at the fifth step. At step two, the ALJ determined that her dysthymic disorder, generalized anxiety disorder, Reiter's syndrome, asthma, carpal tunnel syndrome and obesity were severe impairments, but determined at step three that she did not meet a listing (AR 13-14). At step four, the ALJ determined that Giles had the residual functional capacity to perform sedentary work with a sit/stand option consisting of no more than simple, routine, repetitious tasks with one- or two-step instructions, performed in a low stress environment, defined as work requiring few decisions, that required no more than occasional contact with the public and co-workers (AR 14-15). At the final step, the ALJ found that Giles could perform the jobs cited by the vocational expert at the administrative hearing (AR 17-18). The ALJ also concluded that Giles' allegations regarding her limitations were not totally credible (AR 18). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Giles first argues that the ALJ ignored certain evidence in violation of *Cotter v. Harris*, 642 F.2d 700 (3rd Cir. 1981). *Cotter* dictates that the "administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704. The Third Circuit further explains:

> In our view an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the ... decision is supported by substantial evidence.

12

*Cotter*, 642 F.2d at 705 (quoting *Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974)).

Giles claims that the ALJ's decision is devoid of any discussion of the first hearing held on November 5, 2003. Specifically, she contends that the ALJ failed to explain his apparent "change of mind" with respect to her amended onset date, and failed to discuss her testimony and the weight he accorded it. *Plaintiff's Brief* pp. 10-11. We are of the opinion however, that the ALJ's examination of the evidence did not run afoul of *Cotter*.

We reject Giles' contention that the ALJ found at the first hearing that she was disabled by offering an amended onset date. First, we note that a discussion at an administrative hearing is not the equivalent of findings of fact and conclusions of law as set forth in an ALJ's opinion. Second, a review of the transcript reveals that no such finding was made. The following discussion occurred relative to Giles' alleged onset date with respect to her mental impairments:

> • • •
>
> ALJ: All right. Mr. Anderson, let me tell you where I think we are. I don't think the claimant can do that job, and I'm not sure there's any job that she can do that would require her to go to work eight hours a day, five days a week. Candidly, I don't think her medical problems alone disable her, because, after all, she is a younger individual and would need only to be able to do sedentary work, *but I think we've got a question – at least I have a question, then, about her ability to concentrate and maintain the persistence and pace that you need for almost any job.* But, I see that the claimant alleges disability since 1997, and I do have a problem with that date. And looking over the record, let me tell you what jumps out at me, and if this is a date that you can consider –
>
> REP: Actually, I wasn't aware that that was the alleged onset date.
>
> ALJ: It is. Yes. The alleged – I don't – there's no problem at all with the date last insured, clearly.
>
> REP: Uh-huh.
>
> ALJ: She's all right there. I'll tell you what I have and kind of, frankly, looking at this in Ms. Giles' favor, there was an initial evaluation at [C]ommunity [I]ntegration that took place in June of 2000. That's at Exhibit 3F pages 30 through 32.
>
> REP: Uh-huh.

> ALJ: I think that – they came up with a, with a GAF of 45. To me, that's a legitimate starting point. Very candidly, I don't find anything earlier. But before that is the date that we use, I would have to know from you and Ms. Giles that she understands that. And what I'm going to do in a moment is go off the record and ask you to step outside and just chat briefly about this with Ms. Giles, and see if that's a date that's acceptable to you. *There's other – one other thing I want, just so we're clear, Mr. Anderson. I'm – I still very much want you to submit those updated treatment records, and I will review those. If they show something very different than I've seen then I, then I may have to change my mind.*
>
> • • •

(AR 341–342) (emphasis added).

Fairly read, the transcript reveals that the ALJ had a question with respect to Giles' ability to concentrate and maintain persistence and pace, and was simply pointing out the fact that there was no medical evidence of a limitation in this area prior to June 2000. As the discussion makes clear, the ALJ was initially of the opinion that Giles had limitations in this area based on her initial evaluation at Community Integration. However, the remaining discussion reveals that the ALJ sought further medical evidence on this point, and clearly informed Giles' representative that his initial opinion could change based upon any subsequent medical evidence received. Following this hearing, the ALJ secured the opinion of Dr. Martone who opined that Giles was capable of working a normal, 40 hour work week (AR 323). The ALJ appropriately reconvened a second hearing in order to elicit the testimony of a vocational expert in order to determine if there were any jobs Giles could perform given her vocational profile and residual functional capacity.

Moreover, the fact that the ALJ did not discuss the stipulated onset date of June 2000 with respect to her mental impairments is of no moment. The ALJ's adoption of an earlier onset date is, in fact, more beneficial to Giles since the earlier the onset date is set, "the longer is the period of disability and the greater the protection received." *SSR* 83-20 (1983), 1983 WL 31249 *1. The fact is that the ALJ considered medical evidence which both preceded and postdated June of 2000. This is clearly appropriate given the fact that the medical evidence with respect to

her physical impairments begins on October 8, 1997 (AR 234). We therefore find no error in this regard.

We further reject Giles' argument that the ALJ failed to discuss her first hearing testimony. The ALJ summarized Giles' testimony in his decision as follows:

> The claimant testified to chronic knee, back and neck pain and occasional arm pain. She said that her pain medication reduced but did not eliminate the pain. She cited no significant side effects from her medication. The claimant spoke of mood swings and poor concentration.

(AR 16). A cursory review of both hearing transcripts reveals that this testimony was, in fact, elicited at the first hearing.

Giles further argues that the ALJ erred in his evaluation of the vocational expert's testimony. Similar to her first argument, Giles claims that the ALJ failed to discuss the discrepancies in the vocational experts' opinions as to the nature of her prior position. We reject this argument outright since no discrepancy exists. Both Ms. Krull and Mr. Monaco testified that Giles' prior position was classified as heavy and semiskilled (AR 340, 352).

Giles next claims, in essence, that the ALJ failed to accurately portray her limitations in his hypothetical posed to the vocational expert. The law is well established that "[w]hile the ALJ may proffer a variety of assumptions to [a vocational] expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir. 1984). In other words, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987), *citing, Podedworny, supra. See also Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150 (3rd Cir. 1983).

Here, Giles contends that the ALJ failed to include Dr. Fryer's opinion that fatigue would

15

cause her difficulty in working eight hours per day without actual rest. We note that a treating physician's opinion is given controlling weight only when it is well-supported and consistent with the other evidence of record, *see* 20 C.F.R. § 404.1527(d)(2), and may only be rejected on the basis of contradictory medical testimony. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them. *Cotter*, 642 F.2d at 705. In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion. *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Contrary to Giles' contention, we find that the ALJ considered Dr. Fryer's opinion consistent with the above standards. As noted by the ALJ, Dr. Fryer did not render her assessment until October 2003, approximately ten months after Giles' insured status expired, and Giles was required to establish disability on or before December 31, 2002 (AR 15). *See Matullo*, 926 F.2d at 244 (claimant is required to establish that he became disabled prior to the expiration of his insured status). The ALJ further rejected Dr. Fryer's opinion on the basis that her treatment notes began on December 19, 2002, immediately before Giles' insured status expired, and did not provide a basis for an inability to work for eight hours (AR 15). We agree with the ALJ that these treatment notes do not support Giles' claimed limitations. Although Dr. Fryer assessed Giles with a history of Reiter's syndrome with lower back pain and administered a joint injection, physical examination revealed only minimal tenderness over Giles' hip area and no pain was present while lying in her side (AR 238).

The ALJ also rejected Dr. Fryer's opinion on the basis that it was inconsistent with her own residual functional capacity findings. As the ALJ observed, Dr. Fryer found that Giles had

16

an unlimited ability to push and pull with foot controls, which was inconsistent with her finding that Giles could not stand or walk for more than two hours. Finally, the ALJ rejected Dr. Fryer's opinion since it was inconsistent with Dr. Balk's opinion, who found that Giles was capable of performing medium work. It is long-settled that the findings of a non-examining physician may be substantial evidence defeating contrary opinions. *Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991) (ALJ did not err in rejecting opinion of treating physician in favor of opinions from state agency physicians, where treating physicians' opinions were conclusory and unsupported by the medical evidence).

In sum, we conclude that the ALJ's proffered reasons for rejecting Dr. Fryer's opinion are supported by substantial evidence, and accordingly, find no error in his failure to include her limitations in his hypothetical posed to the vocational expert.

Giles argues that the ALJ erred in failing to include Dr. Meyer's limitations that she could not recall events of the last few months, had a poor or no ability to remember and carry out detailed or complex instructions, and only had a fair ability to carry out simple instructions. We disagree. As noted by the ALJ, Dr. Meyer found Giles' thought processes were in order, and did not explain why her symptoms would prevent simple, low stress work (AR 16). The ALJ concluded that Dr. Martone provided a more thorough analysis of Giles' mental state, and was consistent with the state agency psychologist's opinion, who found that her mental impairments were not disabling (AR 16). Moreover, we observe that Community Integration treatment notes reveal that although Giles complained of continued depression, her concentration and cognition were consistently noted as within normal limits (AR 144, 158, 162-164, 292). Finally, the ALJ accommodated Giles' mental limitations in his hypothetical to the vocational expert by limiting her to simple, routine, repetitious tasks with one- or two-step instructions, performed in a low stress environment, that required no more than occasional contact with the public and co-workers.

Giles' last argument challenges the ALJ's credibility determination. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

Here, Giles argues that the ALJ primarily relied upon her daily activities to support his conclusion that she was not entirely credible. In assessing Giles' credibility, the ALJ observed, among other things, that she was able to maintain a household and care for her young children (AR 16). While Giles' activities by themselves clearly would not support a denial of benefits, the ALJ did not, contrary to her contention, rely primarily on these activities alone in determining her credibility. The ALJ's decision explicitly reflects that he also considered the medical evidence of record in determining that Giles' claimed allegations as to the severity of her symptoms and functional limitations were not entirely credible (AR 16). He found that while her Reiter's syndrome could reasonably be expected to cause ongoing pain, sedentary work was not precluded consistent with Dr. Balk's opinion (AR 16). He further noted that while her depression limited her to simple, low stress work, she was nonetheless able to sustain a 40-hour work week as found by Dr. Martone (AR 16). Thus, the ALJ's findings were comprehensive with reasons provided for the evidence he rejected. We therefore find that the ALJ's credibility determination was not based primarily on Giles' daily activities, and his findings, together with the medical evidence of record, are supported by substantial evidence.

## IV. Conclusion

Based upon the foregoing reasons, the Commissioner's final decision will be affirmed. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENITA A. GILES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-201 Erie |
| ) | |
| v. ) | |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 9th day of January, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment, or alternatively, Motion for Remand [Doc. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 11] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Benita A. Giles. The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.